John H. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 110050.
United States Tax Court
1943 Tax Ct. Memo LEXIS 432; 1 T.C.M. (CCH) 672; T.C.M. (RIA) 43101; February 26, 1943
*432 Clarence D. Phillips, Esq., 805 Electric Bldg., Portland, Ore., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax in the amounts of $33,502.64 and $29,444.39, respectively, for the years 1938 and 1939. Respondent added penalties to the deficiencies in the amounts of $1,675.13 and $1,472.22, under section 293(a) of the Revenue Act of 1938, for negligence in failing to report the transactions which gave rise to the deficiencies. The questions in issue are: (1) Whether petitioner realized taxable income during the years 1938 and 1939 to the extent of the difference between the purchase price and the fair market value of certain stock acquired by him pursuant to an option granted by his employer in the year 1934. (2) Whether petitioner is liable for the 5 percent penalty. (3) Whether petitioner sustained an ordinary loss or a capital loss on certain units of interest in the San Juan Mining Syndicate which became worthless during the year 1939. The returns were filed with the collector of internal revenue for the district of Oregon. Findings of Fact Issues (1) *433 and (2): Petitioner resides in Portland, Oregon. After the world war, petitioner became an employee of the Western Cooperage Company, an Oregon corporation, hereinafter called Western, and has been in its employ ever since. Petitioner has been employed in different executive capacities with Western; at the present time, he is general manager of the company. Prior to 1933, the Hawley Pulp and Paper Company, a Delaware corporation, hereinafter called Hawley, was having financial difficulties. Among its liabilities were outstanding bonds, and a bondholders' protective committee was formed. Western, at the request of the bondholders' committee, took over the management of Hawley. A reorganization committee was appointed. This committee submitted a plan of reorganization, dated as of January 18, 1934, which was adopted during the year 1934. Petitioner personally took an active part in the reorganization. He interviewed many of the holders of the Hawley securities and was successful in getting a substantial amount of securities deposited under the reorganization plan. The reorganization plan provided that Western would, at its option, continue to manage Hawley, as long as it was not *434 in default under the plan. The management, under Western, was to retire annually a certain amount of the outstanding indebtedness during each year. Compensation for management was provided for as follows: When the amount of $1,400,000 of the total indebtedness of $2,790,150 was retired, the depositary, The Bank of California, National Association, was to deliver shares of Hawley's second preferred stock and voting trust certificates of common stock, hereinafter called common stock, to Western. The amount of stock to be delivered was that number of shares which would bear the same ratio to the total shares deposited as the amount of the indebtedness retired bore to the total indebtedness. Thereafter the remaining shares of second preferred stock and common stock were to be delivered to Western on the same basis. There were deposited with the depositary 174,378 shares of common stock of Hawley pursuant to the reorganization plan. In December of 1934, Watson Eastman, who was president and general manager of Western gave a verbal option to petitioner as a reward for services rendered by petitioner prior to December 10, 1934, in connection with the reorganization of Hawley. Upon advice *435 of counsel, Western, by corporate resolution, dated May 4, 1937, authorized the execution and delivery of a formal written option, dated as of December 10, 1934, embodying the same terms as the oral option. This resolution stated, in part, that the president of Western had given "to John H. Smith, in consideration of his services theretofore rendered in negotiating the plan of reorganization of Hawley Pulp and Paper Company and in bringing about the deposit of securities enabling the confirmation of said plan by decree of the District Federal Court of Portland, Oregon, an option", and "that the executive officers of this corporation be authorized and directed on behalf of this corporation to execute and deliver, as of the 10th day of December, 1934, to John H. Smith, a formal option substantially setting forth the option and the terms and provisions thereof as hereinbefore in this resolution recited." Western, pursuant to the above resolution, executed a written option as of December 10, 1934. The written option provided, inter alia, as follows: * * * in consideration of services rendered by John H. Smith of Portland, Oregon, hereinafter called "said Smith", prior to the date *436 hereof, in negotiating the plan of reorganization as set forth in the reorganization indentures between Hawley Pulp and Paper Company, hereinafter called the "Hawley Company", and its depositing security holders of date January 18, 1934, and in bringing about the deposit of securities enabling the confirmation of said plan, does hereby, on this 10th day of December, 1934, grant unto the said John H. Smith, his heirs or assigns, the following several options, either one of which, or both of which, may be exercised by the said Smith, his heirs or assigns, upon compliance by him or them with the terms of the option which is being exercised by him or them; said options are expressed and conditioned as follows, to-wit: OPTION B. 1. To purchase on or before January 1, 1940, at a price of $7437.70, the right to receive all common stock of the Hawley Company in excess of 100,001 shares of the common stock of the Hawley Company to be received by the Cooperage Company in the performance of its management contract referred to in said plan of reorganization. 2. This option shall be void unless exercised by the said Smith, his heirs or assigns, on or before January 1, 1940. 3. It is possible *437 that the said Smith, his heirs or assigns, may exercise this option and that the said Cooperage Company, by reason of management defaults, may be entitled to receive only a portion of the Common Stock of the Hawley Company placed in escrow under said reorganization plan, and if such be the case then the Cooperage Company will, upon such exercise of this option and upon the written request of said Smith so to do, file with the Depositary holding said Common Stock in escrow under the terms of said reorganization plan a written notice that it has sold to said Smith, his heirs or assigns, its right to receive under said reorganization plan 74,377 shares of the Common Stock of the Hawley Company, and with said written notice the Cooperage Company will file with said Depositary a written order directing the said Depositary to thereafter deliver to the Cooperage Company and said Smith, his heirs or assigns, the Common Stock of the Hawley Company held by it in escrow and which the Cooperage Company may be entitled to receive, in the proportion of six shares to the Cooperage Company and four shares to the said Smith, his heirs or assigns, until the Cooperage Company shall have received 100,001 *438 shares and the said Smith, his heirs or assigns, shall have received approximately 66,667 shares, and thereafter to deliver the balance of said stock of approximately 7,710 shares to the said Smith, his heirs or assigns. 4. In case this option shall be exercised by said Smith, his heirs or assigns, and if the Cooperage Company may have earned the release to it of said stock in accordance with the provisions set forth in said reorganization plan, then all such deliveries of said Common Stock shall be made by the said Depositary to said Cooperage Company and to said Smith, his heirs or assigns, in the proportion in the next preceding paragraph stated. 5. This option may be exercised at any time hereafter until January 1, 1940, by the delivery by said Smith, his heirs or assigns, to the Cooperage Company of his or their written declaration of the exercise of this option together with the option price of Seven thousand four hundred thirty-seven and 70/100 Dollars ($7437.00). On or before March 18, 1938, Western reduced the outstanding indebtedness of Hawley by the amount of $1,409,720. Petitioner, in March of 1938, exercised his option and paid Western the amount of $11,180.70, by *439 check dated March 21, 1938, which represented the payment of $7,437.70 for 74,377 shares of common stock at ten cents a share, and $3,743 for 3,743 shares of second preferred stock at one dollar a share. The preferred stock is not involved in this proceeding. Western by order dated March 18, 1938, made demand on the depositary to deliver 50,939 1/2 shares of Hawley common stock to Western, and 33,759 shares of such common stock to petitioner. During the years 1938 and 1939 petitioner received shares of Hawley common stock as follows: 33,759 shares on March 19, 1938; 3,661 shares on February 3, 1939; 2,680 shares on November 1, 1939; and 6,033 shares on December 28, 1939; total number of shares received in 1939, 12,374. On December 10, 1934, the common stock of Hawley had a market value of not more than ten cents a share. Western, in recording the receipt of $7,437.70 from petitioner, debited cash and credited an account entitled "John H. Smith Investment". When petitioner received the stock, the same account was debited, and the Profit and Loss Account for 1938 was credited with the amount of $7,437.70. In its income tax return for the year 1938, Western reported this transaction *440 with petitioner as resulting in a capital gain of $7,437.70, with the explanation, "Sale of our right to receive 74,377 Shares Common Stock of Hawley Pulp and Paper Company". Petitioner did not report any income for the year 1934 on account of the receipt of the option. Petitioner did not report in his returns for the years 1938 and 1939, his acquisition of the common stock of Hawley. Respondent determined that the common stock of Hawley, received by petitioner during the years 1938 and 1939 had a fair market value at the time the stock was received in the respective amounts of $84,397.50 and $72,901.38, and that, accordingly, petitioner realized income to the extent of the excess of the fair market value over and above the price paid for the stock upon the exercise of the option. During the years 1940 and 1941, petitioner sold approximately 31,939 shares of common stock of Hawley. Petitioner reported these sales and used ten cents a share as a cost basis in computing his gain. The excess of the fair market value over the option price of the common stock of Hawley, received by petitioner during the taxable years, constituted income to petitioner in the respective amounts of $81,021.60 *441 and $71,663.98. Petitioner's failure to report income from the receipt of the Hawley stock in each taxable year was due to an honest mistake of law and was not due to negligence or an intentional disregard of respondent's regulations. Issue (3): On July 17, 1937, petitioner purchased four units of interest in the San Juan Mining Syndicate for the total sum of $1,000. The said units of interest became worthless on or about April 25, 1939. Petitioner did not receive any money by reason of the liquidation of this syndicate and charged off on his books as worthless all interest in the syndicate. Opinion Issue (1). The question is whether the difference between the option price and the fair market value of the common stock acquired pursuant to the option is taxable as a gain resulting from a bona fide sale and purchase, or as compensation to petitioner for personal services. If the gain constituted compensation to petitioner, it is taxable as income in the years when the stock was received. Respondent added the sums of $81,021.60 and $71,660.98 [1] to petitioner's net income for the years 1938 and 1939, respectively, upon the theory that such amounts represented additional *442 compensation received by petitioner in each of the taxable years. Respondent determined that these sums, which were the excess of the fair market value over the option price of the common stock acquired by petitioner pursuant to the option, were income under section 22(a) of the Revenue Act of 1938. Section 22(a) defines "gross income" as including "gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid * * *". Article 22(a) (1) of Regulations 101, promulgated under the provisions of the Revenue Act of 1938, provides in part as follows: * * * If property is transferred by a corporation to a shareholder, or by an employer to an employee, for an amount substantially less than its fair market value, regardless of whether the transfer is in the guise of a sale or exchange, such shareholder or employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of (1) compensation for services rendered or to be rendered or (2) a distribution of earnings or profits taxable as a dividend, *443 as the case may be. In computing the gain or loss from the subsequent sale of such property its basis shall be the amount paid for the property, increased by the amount of such difference included in gross income. * * * Petitioner has not contested respondent's determination of the fair market value of the stock received by petitioner during the taxable years. Therefore, if it is found that the difference between the option price and the fair market value of the stock was compensation to petitioner, respondent must be sustained. Petitioner contends this differential was not compensation for personal services, but a gain resulting from a bona fide purchase and sale. Petitioner has cited a number of cases in support of his contentions. These *444 cases merely hold that under the facts of each case, the options were not given as compensation for services, but for some other reason such as to increase the employee's interest and proprietary attitude toward the employer corporation. Respondent relies on (appealed CCA 6, January 15, 1942 1a). In that case it was stated: The facts in the instant proceedings show that the options given to Connolly and to Anderson were for the purpose of granting them additional compensation for services already performed and currently being performed. If Connolly and Anderson upon the receipt of those options had immediately exercised them, we think it would have to be held that each received taxable income of the difference between the amount paid for the shares and their fair market value. See . Connolly and Anderson did not, however, exercise the options during 1935. They waited until January 30, 1936, at which time the fair market value of the shares was $ 5 per share. Quite clearly the Hayes Body Corporation paid Connolly and Anderson no additional compensation *445 in 1935. If the options had never been exercised the optionees would never have received any additional compensation. But when the options were exercised the company parted with shares of stock which could have been sold at $5 per share. * * * Petitioner was instrumental in consummating the reorganization plan of Hawley. Under the plan, Western would receive considerable compensation if it was successful in its management of Hawley. It is indisputable that Western give the option to petitioner as compensation for services rendered in effecting the reorganization plan of Hawley. It is so stated in the Western corporate resolution and in the option itself. Furthermore, petitioner testified that the option was given to him as compensation for such services. If petitioner had not exercised the option, Western would have received all of the Hawley common stock. When petitioner exercised his option and received the stock, Western parted with the right to receive stock which had a much greater value than the option price. Under the reasoning of the Connolly case, petitioner received compensation to *446 the extent of the differential. Petitioner has suggested several factual dissimilarities in this case to distinguish it from the Connolly case, which are not material. The basic facts are that petitioner was given an option as compensation for services and that he realized gains in the taxable years pursuant to the exercise of this option. It is a settled rule that when an option is given to an employee as compensation for services, rendered or to be rendered, the gain realized through the exercise of such option is taxable as realized compensation. ; ; and Accordingly, it is held that the difference between the option price and the fair market value of such common stock acquired by petitioner pursuant to the option was taxable as compensation received by petitioner in the taxable years. Issue (2). Respondent has imposed the negligence penalty under section 293 (a) of the Revenue Act of 1938, [2] because of petitioner's failure to report in his return income realized from a transaction *447 discussed under Issue (1). The statute is so worded that the taxpayer is allowed to show that his omission in his tax return was without intent to defraud and was without intentional disregard of rules and regulations. If the taxpayer shows that there has not been any negligence or an intentional disregard of rules and regulations, he may establish that he is not liable for the penalty. The transaction between Western and petitioner was of such nature that the effect in the taxable year upon petitioner's income tax liability involved a construction of law which in and of itself is difficult. We are satisfied from the record that petitioner's *448 failure to report the excess of the fair market value of the stock over the option price as income was due to an honest misunderstanding of law and not to negligence or intentional disregard of regulations. Western treated the transaction as a sale and not as compensation. Petitioner, under a misunderstanding of the law, took the same view. It is held that the penalty provided for under section 293(a) should not be imposed upon the petitioner. Issue (3). The question is whether the syndicate units which had been purchased on or about July 17, 1937, and which became worthless in the year 1939 were "securities" as defined in section 23(g) (3) of the Revenue Act of 1938. [3] Respondent determined that the interests in the syndicate were tantamount to shares of stock, and that they were capital assets under section 117(a). Respondent held then that when the interests in the syndicate became worthless in 1939, the allowable loss was limited by the provisions of section 117, the loss being considered as a loss from the sale or exchange of a capital asset, under section 23(g)(2). [3] Since they had been held for more than two years, respondent held that the allowable loss was 50 percent *449 or $500, under section 117(b). Petitioner in his return for the year 1939 deducted the amount of $666.66 as a capital loss. Petitioner now contends that he is entitled to deduct the entire amount of the cost of the interests, as an ordinary loss under section 23(e)(2). Petitioner claims that he has overpaid the tax because of an understatement of the loss. In our opinion respondent's determination must be sustained under section 23(g)(2). Petitioner has failed to show that the syndicate was not a "corporation" within *450 the meaning of that term as defined by section 901(a) (2). [4] The term corporation includes associations. It is a question of fact whether or not a syndicate is a "corporation" for purposes of the revenue act. Petitioner has not submitted any evidence relating to the nature of the organization of the San Juan Mining Syndicate. It is impossible, for failure of proof, to hold that this syndicate was not an association or a corporation, under the statute, in the nature of its structure. Petitioner has failed to meet his burden of proof on this question. It is held that the loss deduction is limited to $500 under section 23(g)(2). Decision will be entered under Rule 50.
Footnotes
1. This amount is the difference between the cost of 12,404 shares at 10 cents a share, and a fair market value of $72,901.38. At the hearing it was shown that the total number of shares received in 1939 at various dates, was 12,374 shares, but that the total fair market value was not other than $72,901.38. With this correction, the difference between the cost and the fair market value is $71,663.98 as stated in the findings of fact.↩
1a. BTA decision affirmed by CCA-6, .↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY (a) Negligence. - ↩ If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272(i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME In computing net income there shall be allowed as deductions: (g) Capital Losses. - (2) Securities Becoming Worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this title, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. (3) Definition of Securities. - ↩As used in this subsection the term "securities" means (A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares.
4. SEC. 901. DEFINITIONS (a) When used in this Act - (2) The term "corporation" includes associations, joint-stock companies, and insurance companies.↩